## Davenport, Trustee, et al. *v.* Pennsylvania Railroad Company, Appellant.

Argued January 17, 1950. Before MAXEY, C. J., DREW, LINN, STERN, STEARNE and JONES, JJ.

*Owen B. Rhoads,* with him *F. Hastings Griffin, Jr.,* and *Barnes, Dechert, Price & Myers,* for appellant.

*Richardson Dilworth,* with him *James A. Sutton, Aaron M. Fine* and *Paxson, Kalish, Dilworth & Green,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, March 20, 1950:

This is an appeal from the refusal of defendant's motion for judgment n. o. v. in an action for wrongful death.

Viewed in the light most favorable to the plaintiff, the facts are recited in the opinion of Judge LEVINTHAL in the court below:

"The defendant, Pennsylvania Railroad Company, owned a siding constructed on a coal trestle on premises owned by it and leased to J. M. Bruner & Company, a firm engaged in the coal business. The tracks enter the siding from the northeast and straighten out in an east-west direction approximately 315 feet from the bumper block which is located at the western end of the trestle.

"At the time of the accident there were catwalks on both sides of the tracks on the trestle. Beneath the trestle were bins for various kinds and sizes of coal. The coal was delivered by the defendant railroad company in cars which were moved onto the trestle and spotted (i. e., placed on an appointed or desired spot: Webster's Collegiate Dictionary; *supplied*) over the hoppers leading to the proper bins.

"The plaintiff's decedent, Davenport, was the yard foreman for the Bruner Company. Part of his duties consisted of directing the train conductor as to the proper places at which to spot the loaded cars. It was customary for Davenport to go up to the north catwalk of the trestle, where he would join the conductor and give him instructions which the conductor passed on to the switching crew. These operations were usually conducted from the north catwalk because from there the whole length of the train could be observed, and from there the proper alignment of the car hoppers and bin hoppers could best be made. The only way to get from the yard to the north catwalk was by means of a stairway that led from the yard to the south catwalk, then across the tracks to the north catwalk. The crossing had to be made in front of the bumper block since there was no way of passage behind it. In crossing the tracks one could walk directly over them or one might climb up and over the narrow end-sill of a coal car.

". . . (There) were three coal cars standing on the trestle. The car nearest the bumper block was loaded with pea coal and was a distance of three or four feet from the bumper block. To the east of the loaded car, and coupled to it, was an empty car, and about half a car length beyond the end of that empty car was another empty one. A shifting engine with six empty cars attached to it came onto the siding. The conductor in charge of the train walked along the north catwalk and conversed with Davenport who was in the coal yard below. Davenport asked the conductor what he had coming in, and the conductor told him he had nothing coming in, but was going to take the two empties out and pull the loaded car up into position. Davenport then said, 'I'll be right up,' and he started for the stairway leading to the catwalk and was last seen five or six feet away from the stairway. The conductor, meanwhile, signalled for the switching engine to come for-

ward to make the couplings. The easternmost empty car was coupled and then the train, in response to signals from the conductor, moved forward to couple the two cars nearest the bumper block. It is obvious that Davenport was crossing from the south to the north catwalk when the second contact was made. The coupling pin failed to drop and the last two cars drifted back against the bumper block, crushing Davenport and inflicting the injuries from which he died shortly after. It was testified, however, that even had the coupling pin caught, the cars would in any event have hit the bumper block in running out the slack in the couplings. The testimony in this regard was, however, contradictory. One witness for the defendant testified that each of the couplings would normally take up a slack of 'a couple of inches', and another testified that the normal slack was four or five inches and estimated that the total drift of the last car was 'a foot and a half to two foot'. There was testimony to the effect that the distance between the bumper block and the last car was four feet.

"The testimony also disclosed that the conductor had been bringing coal cars into the Bruner yard almost daily for a period of about a year, and that he knew Davenport and was familiar with his duties, which included not only giving instructions on the spotting of cars, but also the opening and closing of the hoppers underneath the coal cars. The conductor testified that Davenport could have crossed from the south to the north catwalk by climbing up and over the narrow end-sill of the coal car, but that he had seen him on previous occasions cross the tracks directly. He testified he sometimes crossed the tracks himself rather than use the end-sill."

The questions on appeal relate to defendant's negligence and the contributory negligence of plaintiff's decedent, viz.: whether the conductor was negligent, under the circumstances, in prematurely causing the movement of the train and whether the decedent was contributorily

negligent in crossing the track during the coupling operation.

There was testimony that the conductor was familiar with, and regularly participated in, decedent's known and customary procedure of spotting and unloading cars. The decedent and conductor acted in unison. Decedent indicated where the loaded cars were to be placed for unloading. The conductor gave the necessary signals to the engineer. When the cars came on the siding at the time of the accident decedent called to the conductor that he would be "right up", meaning that he would come up on the trestle from the ground where he stood, in order to spot the car. The conductor therefore should have anticipated decedent's presence on the tracks. It was, therefore, for the jury to determine whether it was negligent, under the narrated circumstances, for the conductor to have *then* started the train: *Nadazny v. Philadelphia & Reading Railway Company*, 266 Pa. 305, 109 A. 625; *Gentile v. Philadelphia & Reading Ry.*, 274 Pa. 335, 118 A. 223.

Contributory negligence by the decedent cannot be declared *as matter of law* in this case. Contributory negligence may only be so declared when it is so clearly revealed that fair and reasonable persons cannot disagree as to its existence: *Silfies, Admrx., v. American Stores Company*, 357 Pa. 176, 53 A. 2d 610; *O'Connor v. Philadelphia Suburban Transportation Company*, 362 Pa. 404, 66 A. 2d 818. There was no reason for decedent to suppose that the operations on that day were to be performed differently from the way in which they had been previously and customarily performed. It was for the jury, and not for the court, to determine whether or not decedent was negligent in crossing the track from the south to the north catwalk between the end of the train and the bumper block: *Wilson Christman v. Phila., etc., R. Co.*, 141 Pa. 604, 21 A. 738. The situation in *Neal v.*

*Buffalo, Rochester & Pittsburgh Ry. Co.*, 289 Pa. 313, 137 A. 453, is not analogous. There the deceased *knew* that a coupling operation was about to be made but nevertheless stepped onto the track behind one car and was crushed between the cars. In the present case decedent was given no reason to believe that there would be a train movement until he reached the conductor's side.

The case was properly submitted to the jury.

Judgment affirmed.